1
2
3
4
5
6
7
8                   IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10    BARRY DEWAYNE WOODS,

11              Petitioner,              No. CIV S-01-1724 LKK KJM P

12        vs.

13    ROBERT L. AYERS,

14              Respondent.              FINDINGS AND RECOMMENDATIONS

15    _____/

16              Petitioner is a state prisoner proceeding pro se with his third amended petition for

17    a writ of habeas corpus under 28 U.S.C. § 2254.  He challenges his 1998 conviction for

18    possession of heroin for sale and possession of contraband in state prison and the resulting three

19    strikes sentence on five grounds: (1) the court erred in ordering him to be shackled during trial;

20    (2) the prosecutor committed misconduct during argument; (3) the state failed to preserve

21    evidence and thus deprived petitioner of due process; (4) the court erred in denying petitioner's

22    motion for release of the personnel records of the chief witness against him; and (5) the evidence

23    is insufficient to support the conviction of possession of heroin for sale.

24    I.  Factual And Procedural Background

25              Correctional Sergeant Antonio Gold was on duty in the C-Facility of California

26    State Prison Sacramento (CSP-Sac) on February 25, 1997, conducting random searches of

1  inmates coming onto the yard.  RT 76, 80.[1]  Gold stopped petitioner, who was wearing a blue

2  chambray shirt, perhaps some tattered sweat pants, and some cut off jeans with pockets in front

3  and back.  RT 81.  Gold found a piece of paper in petitioner's shirt pocket and a marijuana

4  cigarette in one of petitioner's pockets.  RT 82, 149.

5        Gold  handcuffed petitioner and, along with Correctional Officer Celso Zamudio,[2]

6  took him to a holding area for a thorough search.  RT 82-83, 299-300.  Petitioner removed his

7  clothing and piled it on the floor, but shook his underwear and threw it to the left.  RT 301.

8  Zamudio could see a lump in the fly area of petitioner's underwear.  RT 302.  Gold felt a lump in

9  that seam of petitioner's boxer shorts and took them to the C-Facility office, where he extracted

10 four bindles of heroin.  RT 85-86, 106.[3]  Gold confiscated the boxer shorts but returned

11 petitioner's other clothing to the holding area.  RT 106.

12        Gold did not believe petitioner was under the influence of a controlled substance.

13 RT 94.  Based on his education and training, Gold believed the heroin was possessed for sale

14 even though he found no other indicators of drug sale activity.  RT 108-110.  He based his

15 opinion on the following facts: inmates generally hide their personal supplies of drugs in their

16 living quarters or in a body cavity; inmates with drugs to sell generally take them out to the yard,

17 where it will be easier to distribute them to other inmates; petitioner was carrying about two

18 grams of heroin, which translates to about sixty single-use doses and which would be worth

19 approximately $1,000.00 in the prison setting; the heroin was wrapped in four separate packages,

20 which would make it easier to hand off to other inmates, whereas drugs kept for personal use

21 _____

22   [1]  "RT" refers to the Reporter's Transcript; "ART" to the Augmented Reporter's
   Transcript; and "CT" to the Clerk's Transcript of the state court proceedings.  All are lodged with
23 this court.

24   [2]  Zamudio conceded he had not prepared a report of his observations, explaining that he
   had not been involved in handling the evidence and so did not think a report was necessary.  RT
25 317.  He said his testimony was based on his memory of the incident.  RT 321.

26   [3]  The presumptive field test suggested the bindles contained heroin, a finding confirmed
   by the criminalist.  RT 87, 250, 328.

1   would more likely be in a single package.  RT 126-127.

2        Correctional Officer Robert Buda testified as an expert on narcotics sales in state

3   prisons.  RT 272.  Based on a hypothetical question embracing the facts as developed during the

4   prosecution's case, Buda testified that the heroin would have been possessed for sale.  RT 274.

5   The amount was "not quickly usable" in prison; the average saleable dose in prison is .03 of a

6   gram, which sells for about $50, while the average usable dose is .01 of a gram.  RT 274-275.

7   The packaging suggested sales.  The amount would produce an overdose if used all at once, so

8   generally the excess would be hidden; that it was accessible in the seam of a pair of boxer shorts,

9   a common place for caching drugs,  again suggested it was possessed for sale.  RT 274-275.

10  Moreover, an inmate without marks for injection and who was not under the influence of drugs

11  would most likely possess drugs for sale, given the penalties for possession of drugs in prison.

12  RT 276-277.

13       Inmate Irvin Tatum was on the yard of 5 Block on the morning of February 27,

14  1997.  He described petitioner's clothes as a "blue state-issued shirt and . . . like some raggedy

15  cutoff sweat pants."  RT 458.  The sweat pants had no pockets; inmates were not permitted to

16  have sweat pants with pockets.  RT 468, 471.   It appeared to Tatum that Gold singled petitioner

17  out for a pat-search.  RT 470.  Tatum saw Gold handcuff petitioner and escort him from the yard.

18  RT 458.  Although Tatum did not see Zamudio escorting petitioner, he saw Zamudio

19  participating in the search.  RT 458, 460.

20       Inmate Morris Ervin also was a resident of 5 Block.  RT 474.   He came out of

21  section B of 5 Block with petitioner on the morning of February 27, 1997.  RT 476.   Petitioner

22  was wearing a blue shirt and ragged, torn up sweat pants; inmates were not allowed to have sweat

23  pants with pockets.  RT 478.  Gold took a piece of paper out of petitioner's shirt pocket.  RT 476.

24  The paper appeared to be a "kite" or inmate-to-inmate letter.  RT 476.  Ervin watched Gold

25  escort petitioner out of the yard; no other officer was with them.  RT 477.  Ervin had seen Gold

26  harass other inmates.  RT 485.  He characterized Gold as a corrupt officer who had threatened to

3

1  plant drugs on him.  RT 495-496.

2          Petitioner was convicted of possession of contraband in state prison and

3  possession of heroin for sale.  RT 560-561.  In addition, the jury found that petitioner had

4  suffered prior convictions for murder, attempted murder, assault with a firearm and possession of

5  phencyclidine for sale.  RT 561-563.  He was sentenced to a total term of twenty-nine-years-to-

6  life, to run consecutively to the life term he was already serving.  RT 608-609.

7  II.  Standards Under The AEDPA

8          An application for a writ of habeas corpus by a person in custody under a

9  judgment of a state court can be granted only for violations of the Constitution or laws of the

10  United States.  28 U.S.C. § 2254(a).  Federal habeas corpus relief also is not available for any

11  claim decided on the merits in state court proceedings unless the state court's adjudication of the

12  claim:

13          (1) resulted in a decision that was contrary to, or involved an
            unreasonable application of, clearly established federal law, as
14          determined by the Supreme Court of the United States; or

15          (2) resulted in a decision that was based on an unreasonable
            determination of the facts in light of the evidence presented in the
16          State court proceeding.

17   28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA").  See Ramirez v. Castro,

18  365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief

19  under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth

20  Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538

21  U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did

22  not address the merits of petitioner's Eighth Amendment claim).[4]  Courts are not required to

23

24          [4] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals
    held in a § 2254 action that "any independent opinions we offer on the merits of constitutional
25  claims will have no determinative effect in the case before us . . .  At best, it is constitutional
    dicta."  However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain
26  relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees.  Title
    28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation

1  address the merits of a particular claim, but may simply deny a habeas application on the ground

2  that relief is precluded by 28 U.S.C. § 2254(d).  Lockyer, 538 U.S. at 71 (overruling Van Tran v.

3  Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district

4  courts to review state court decisions for error before determining whether relief is precluded by

5  § 2254(d).  It is the habeas petitioner's burden to show he is not precluded from obtaining relief

6  by § 2254(d).  See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

7          The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are

8  different.  As the Supreme Court has explained:

9          A federal habeas court may issue the writ under the "contrary to"
        clause if the state court applies a rule different from the governing
10        law set forth in our cases, or if it decides a case differently than we
        have done on a set of materially indistinguishable facts.  The court
11        may grant relief under the "unreasonable application" clause if the
        state court correctly identifies the governing legal principle from
12        our decisions but unreasonably applies it to the facts of the
        particular case.  The focus of the latter inquiry is on whether the
13        state court's application of clearly established federal law is
        objectively unreasonable, and we stressed in Williams [v. Taylor,
14        529 U.S. 362 (2000)] that an unreasonable application is different
        from an incorrect one.

15

16  Bell v. Cone, 535 U.S. 685, 694 (2002).  A state court does not apply a rule different from the

17  law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply

18  fails to cite or fails to indicate an awareness of federal law.  Early v. Packer, 537 U.S. 3, 8

19  (2002).

20          The court will look to the last reasoned state court decision in determining

21  whether the law applied to a particular claim by the state courts was contrary to the law set forth

22  in the cases of the United States Supreme Court or whether an unreasonable application of such

23  law has occurred.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S.

24  919 (2003).  Where the state court fails to give any reasoning whatsoever in support of the denial

25  _____

26  of the Constitution before he or she may obtain habeas relief.  See Lockyer, 538 U.S. at 70-71;
Ramirez, 365 F.3d at 773-75.

of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court

must perform an independent review of the record to ascertain whether the state court decision

was objectively unreasonable.  <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003).  In other

words, the court assumes the state court applied the correct law, and analyzes whether the

decision of the state court was based on an objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has

been "clearly established" by the Supreme Court and the reasonableness of a particular

application of that law.  <u>See Duhaime v. Ducharme</u>, 200 F.3d 597, 598 (9th Cir. 1999).

III.  <u>The Use Of Restraints</u>

     A.  <u>Factual Background And Court Of Appeal Opinion</u>

On the first day of trial, the court considered petitioner's motion to appear without

restraints before the jury.  RT 30.   It took testimony from Correctional Officer Daniel Rodriguez,

one of the officers who had transported petitioner from CSP-Sac. and who was assigned to

provide security while petitioner was in court.  RT 32.   Rodriguez reviewed

petitioner's history of sustained rules violations:

- 6/5/98:  mutual combat with another inmate,

- 5/20/98:  battery on a peace officer,

- 3/23/98:  resisting staff, which required a cell extraction,

- 6/17/97:  battery on a peace officer,

- 12/10/97: willful delay of a peace officer's duties,

- 10/21/97:  refusing a direct order,

- 6/18/97:  resisting staff,

- 6/17/97: battery on a peace officer,

- 6/6/97: willful obstruction of peace officer in line of duty,

- 3/12/97: behavior which could lead to violence,

- 3/9/97: over-familiarity with staff, and

1          •          11/15/97:  narcotics trafficking.

2    RT 33.  He noted that there were three unadjudicated rules violations reports for battery on an

3    officer, battery on another inmate, and delaying a peace officer in the performance of his duties.

4    RT 34.   For purposes of the hearing, Rodriguez had reviewed petitioner's record only back

5    through 1997, but was aware petitioner had "numerous 115s"[5] stretching back to February 1989.

6    Id.  Rodriguez reported that during earlier court appearances, petitioner acknowledged members

7    of the audience, who appeared to know him.  RT 34.   Finally, the prosecution offered

8    documentary evidence (the "969b packet") concerning petitioner's prior convictions for murder

9    and assault with a firearm.  RT 34-35.

10          The court concluded petitioner should be restrained with a waist chain and

11    handcuffs, but asked the correctional officers to explore whether the restraints for petitioner's

12    wrists could be hidden under his shirt and fashioned so as to give petitioner some limited

13    movement of his arms.  Id.

14          The next day, the court considered the need for leg shackles, recognizing that they

15    could not be hidden from the jury.[6]  RT 55.  Rodriguez once again testified, this time recounting

16    threats petitioner had allegedly made against officers and attributing to him the sentiment that he

17    "loves to see cops die."  RT 56.  Moreover, according to Rodriguez, petitioner was a free lance

18    gang member, who will "run[] with anyone that has money or will pay him to do gang activity."

19    RT 56.  While Rodriguez did not have any specific information about petitioner's potential

20    escape risk, he noted petitioner was a maximum security inmate.  RT 56.

21          The court recognized that the visibility of the leg shackles would "make a

22    statement as to the danger," but observed that petitioner was "on trial for . . . selling drugs within

23    a prison situation. . . .  He is under physical restraint and in custody.  That has to be expected."

24

25          [5]  A "115" is a Rules Violation Report.

26          [6]  It appears that there were no "drapes" for the table to hide the restraints.  RT 55.

7

RT 57.  The court also elicited from Rodriguez that this level of restraint was normal for a prisoner on trial and observed for the record that petitioner was a large, muscular man.  RT 58, 60.

Finally, while the court recognized that the restraints "may well have to be visible to some degree," he asked that the officers "utilize them with tact."  RT 59.  He reiterated his desire that the officers explore the possibility of hiding the restraints so far as possible under petitioner's clothing.  Id.

At the conclusion of the evidence, the trial court instructed the jury:

> The fact that physical restraints have been placed on the defendant, Mr. Woods, is not to be considered by you for any purpose.
>
> They are not evidence of guilt, and they must not be considered by you as any evidence that he is more likely to be guilty than not guilty.
>
> You must not speculate as to why the restraints have been used in determining the issues in this case; disregard this matter entirely.

RT 515.

The Court of Appeal rejected petitioner's challenge:

> Before a defendant may appear in court under physical restraints, there must be a hearing at which the court receives evidence of the defendant's past (or intended) nonconforming conduct, after which the court must make findings of the necessity for restraints which are as unobtrusive as possible while being as effective as needed.  When the court satisfies these criteria, its ruling is reviewed for abuse of discretion.  The court must also on its own motion admonish the jury to disregard the physical restraints.  There is no mandate for restraints to be invisible.  "[S]hackles or manacles are not easily hidden from the jury's view, and [we] do not wish to imply that they should not be used simply because they are obtrusive"; less drastic and visible restraints must be ordered only when the court concludes in its discretion that it is safe to do so.
>
> Although the defendant cites the facts in a number of other cases involving restraints, a defendant cannot succeed when the issue on appeal is the trial court's exercise of discretion and the record presents facts which merely afford an opportunity for a difference of opinion; we are neither authorized nor warranted in substituting our judgment for the judgment of the trial judge.  Given the fact-specific nature of the inquiry and the abuse-of-discretion standard

8

of review, there is little purpose in engaging in a "compare and contrast" exercise with these cases; thus, we simply find these other cases inapposite.

The defendant first contends the failure to supply him with a copy of the report containing the incidents from 1988 and 1990 violated due process. As this information is at most cumulative to the extensive and more recent evidence of the defendant's nonconforming behavior at the highest-security prison in the state, we reject the argument.

The defendant then attacks a straw issue, claiming in two paragraphs that the trial court abused its discretion in characterizing the restraints as normal when other cases describe them as maximum. To this effect he cites the condemnation in *Duran*[7] of general policies allowing restraints. In point of fact, the court was inquiring of the witness whether the level of restraint on the defendant was customary or unusual; it was the escort guard who described it as customary. The record does not show any general policy on the part of the trial court; rather, it sought creative alternatives to the escort guard's approach to security requirements. As there was no evidence before the trial court that any lesser degree of restraint would satisfy the security concerns, [fn], we cannot find an abuse of discretion on these facts.

[fn]. While appellate counsel may view the issue in the abstract and denigrate these concerns, this court is aware of the frequent mayhem in courtrooms from inmates whose creativity is warped into designs of violence.

In a paragraph, the defendant advances a lurking argument (tacking off on tangents not directly related to the heading under which they appear) which intimates his election to represent himself was invalid because there is no showing the court informed him he would be an advocate under restraint. We need not respond. Moreover, nothing in the record suggests the restraints interfered with the defendant's ability to *represent himself*. To the contrary, the court commended him at the conclusion of trial . . . ." Nor did the defendant claim in his motion for new trial that the restraints hampered his *effectiveness* (contending instead prejudice from his appearance). We thus reject this suggestion of an argument.

Answer, Ex. D at 6-9 (Court of Appeal opinion; emphasis in original, citations omitted).

/////

---

[7] <u>People v. Duran</u>, 16 Cal.3d 282 (1976).

9

1    B.  Discovery Of The Report

2           Petitioner argues he was deprived of his right to a fair hearing on the shackling

3    issue when the court refused to release to him the report of his purported threats against officers.

4    Pet. at 16.  As the Supreme Court has noted, however, "[t]here is no general constitutional right

5    to discovery in a criminal case, and *Brady*, which addressed only exculpatory evidence, did not

6    create one."  Gray v. Netherland, 518 U.S. 152, 168 (1996) (internal quotation omitted).   This

7    court has reviewed the report; it is not exculpatory and thus would not have been discoverable

8    under the rationale of Brady v. Maryland, 373 U.S. 83 (1963).  See SCT 1.  Petitioner cannot

9    establish a constitutional error based on the failure to reveal the report.  See Strickler v. Greene,

10   527 U.S. 263, 281-82 (1999).

11   C.  Impact On Petitioner's Faretta Waiver

12          Petitioner argues his Faretta waiver was invalid because the trial court failed to

13   advise him he would be required to represent himself while in "fully visible mechanical

14   restraints."  Pet. at 15.

15          This argument is disingenuous.  After taking testimony from Rodriguez and

16   determining that shackling was necessary, the court arraigned petitioner on the amended

17   information.  RT 36 (conclusion of initial hearing on restraints; petitioner recognizes his hands

18   will be restrained); RT 41 (petitioner asks to be arraigned on amended information).   During the

19   arraignment, the court informed petitioner he had the right to counsel, but noted petitioner had

20   previously asked to represent himself.  RT 44.  Petitioner confirmed that he still desired to

21   represent himself with advisory counsel available.  Id. Accordingly, at the time petitioner

22   reasserted his desire to represent himself, he was aware that he would be representing himself

23   while in "fully visible mechanical restraints."  Id.

24   D.  Shackling

25          Restraining a criminal defendant in the courtroom should be undertaken only as a

26   "last resort," after the court has been "'persuaded by compelling circumstances that some

10

1  measures [are] needed to maintain security." Illinois v. Allen, 397 U.S. 337, 344 (1970); Castillo

2  v. Stainer, 983 F.2d 145, 147 (9th Cir. 1992), as amended in 997 F.2d 669 (9th Cir. 1993).  As

3  the Ninth Circuit has explained:

> A defendant's status as a convicted felon may justify a trial judge's
> concern for security. Standing alone, however, this is not sufficient
> reason to impose physical restraints. In all the cases in which
> shackling has been approved, there has also been evidence of
> disruptive courtroom behavior, attempts to escape from custody,
> assaults or attempted assaults while in custody, or a pattern of
> defiant behavior toward corrections officials and judicial
> authorities.

9  Duckett v. Godinez, 67 F.3d 734, 749 (9th Cir. 1995); see also Ruimveld v. Birkett, 404 F.3d

10  1006, 1016 (6th Cir. 2005).  However, a court is justified in requiring a defendant to be shackled

11  when his prior convictions and gang affiliations suggest the potential for harm or disruption,

12  Wilson v. McCarthy, 770 F.2d 1482, 1485 (9th Cir. 1985), or when a defendant has been

13  involved in jail altercations and has threatened to harm his co-defendant, his lawyer, and a bailiff.

14  Jones v. Meyer, 899 F.2d 883, 885 (9th Cir. 1990).

15      The state courts did not apply this federal law unreasonably in concluding that

16  petitioner's prior convictions and his record of assaultive and defiant behavior in custody

17  justified the restraints.

18      This conclusion is buttressed by several factors.  First, the trial court instructed the

19  jury to disregard the restraints in reaching its verdict.  RT 515.  It is generally presumed that

20  jurors follow the court's instructions regarding whether, and in what respect, something can be

21  considered evidence.  See Aguilar v. Alexander, 125 F.3d 815, 820 (9th Cir. 1997); see also

22  Greer v. Miller, 483 U.S. 756, 767 n.8 (1987) (juries are presumed to follow instruction to

23  disregard inadmissible evidence).

24      Second, because petitioner did not seek a bifurcated proceeding on his prior

25  convictions, the jury was aware that he was in prison for assault with a firearm, attempted

26  murder, murder and possession for sale of phencyclidine.  RT 218-221 (introduction of 969(b)

packet), 179 (cross-examination of Gold).  <u>See</u> <u>Wilkerson v. Whitley</u>, 16 F.3d 64, 68, <u>vacated by</u> 16 F.3d at 68, <u>reinstated in relevant part</u>, 28 F.3d 498, 509 (5th Cir. 1994) (en banc) (jury knew defendant was a convicted felon and could have assumed all convicted felons were restrained in court).

Third, although the restraints suggested petitioner was violent, his propensity for violence was not a critical issue in this case of drug possession in prison.  <u>Compare</u> <u>Rhoden v. Rowland</u>, 172 F.3d 633, 637 (9th Cir. 1999) (shackling not harmless when defendant's tendency toward violence at the heart of the case).

Based on these factors, the state courts did not unreasonably apply clearly established federal law.

IV.  <u>Prosecutorial Misconduct</u>

During the rebuttal phase of trial, the prosecutor argued:

MR. CLANCEY:  I know you heard a lot about people's priors.  It is easy to become numb to these priors but take a moment and think about the type of people that we are dealing with.  Someone who would just as soon lie to you as kill you.

MR.  WOODS: Objection, Your Honor.

THE COURT: Ladies and gentlemen, you are to disregard that comment.  That is not to be considered by you in your decision-making process.

I admonish the District Attorney to refrain from such comments.

MR.  CLANCEY: I apologize, Your Honor.

RT 544-545.   Shortly thereafter, the court addressed the jury again:

While counsel is studying his notes, I want to give you an addendum to the instruction that I just gave you in regards to the comments that were made to you by the prosecutor.

Those insinuations were uncalled for, and I want you to know that the prosecutor has absolutely no evidence to present to you to back up those insinuations.

/////

12

1         The prosecutor's improper remarks amount to an attempt to
      prejudice you against the evidence [sic].  Were you to believe those
2         unwarranted insinuations and convict the defendant on the basis of
      them, I would declare a mistrial.  Therefore, you must disregard
3         those improper and unsupported remarks.

4   RT 546-547.

5         The state Court of Appeal rejected petitioner's claim of error:

6         The defendant contends the admonition was insufficient to cure the
      effect of the prosecutor's unwarranted appeal to the prejudice of
7         the jury, particularly in light of the defendant's physical restraints.
      However, this was an isolated remark, and we cannot conceive of a
8         more pointed admonition to the jury.  To the extent the defendant
      attacks the misconduct itself, it is controlling law that we must
9         deem admonitions to cure all but admission of direct evidence of a
      defendant's guilt, or else risk jurisprudential anarchy.

10

11   Answer, Ex. D at 10 (citations omitted).

12         In general, a prosecutor's actions will not be grounds for habeas relief unless they

13   "'so infected the trial with unfairness as to make the resulting conviction a denial of due

14   process.'"  Darden v. Wainwright, 477 U.S. 168, 180 (1986) (quoting Donnelly v. DeChristoforo,

15   416 U.S. 637 (1974)).  In gauging the fairness of petitioner's trial, this court may consider

16   whether the jury was instructed to disregard the challenged argument.  Darden, 477 U.S. at 182;

17   Tan v. Runnels, 413 F.3d 1101, 1115 (9th Cir. 2005).

18         This court finds no fault with the state court's resolution of this claim.  The

19   prosecutor's remark, though improper, was isolated and was met with a specific instruction that it

20   was improper and would produce a mistrial if the jury were to consider it.  Once again, this court

21   must presume the jury took the judge's words to heart.  Id. at 1115.

22   V.  Procedural Default

23         Respondent argues this court cannot reach the merits of petitioner's third, fourth

24   and fifth claims because the Sacramento County Superior Court denied them on procedural

25   grounds.  Answer at 12 & Ex. H (Superior Court order).

26   /////

1    In <u>Coleman v. Thompson</u>, 501 U.S. 722 (1991), the U.S. Supreme Court held that

2  federal courts should not review an alleged violation of federal law on habeas review if the state

3  court's decision rests on an independent and adequate state ground.

4          In all cases in which a state prisoner has defaulted his federal
       claims in state court pursuant to an independent and adequate state
5       procedural rule, federal habeas review of the claims is barred
       unless the prisoner can demonstrate cause for the default and actual
6       prejudice as a result of the alleged violation of federal law, or
       demonstrate that failure to consider the claims will result in a
7       fundamental miscarriage of justice.

8  <u>Id</u>. at 750.

9          Respondent relies on the Sacramento County Superior Court's denial of

10  petitioner's state habeas petition, which found the three issues not cognizable because they "were

11  part of the record at trial and could have been appealed."  Answer, Ex. H.  However, the

12  California Supreme Court also denied petitioner's application for collateral relief on slightly

13  different procedural grounds.  It is this later order that is determinative of the viability of any

14  procedural bar.  <u>See</u> <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 802-03 (1991) (only if the last ruling is

15  an "unexplained order (by which we mean an order whose text or accompanying opinion does

16  not disclose the reason for the judgment)" does this court "look through" to a lower court's

17  determination).

18          The California Supreme Court relied on five cases in denying petitioner's habeas

19  petition: <u>In re Clark</u>, 5 Cal.4th 750 (1993), <u>In re Robbins</u>, 18 Cal.4th 770 (1998), <u>In re Dixon</u>, 41

20  Cal.2d 756 (1953), <u>In re Waltreus</u>, 62 Cal.2d 218 (1965) and <u>In re Lindley</u>, 29 Cal. 2d 709

21  (1947).  Answer, Ex. L (California Supreme Court order).  The citation to <u>Clark</u> and <u>Robbins</u>

22  suggest the Court found all or part of the petition untimely.  <u>See</u> <u>Bennett v. Mueller</u>, 322 F.3d

23  573, 579 (9th Cir.), <u>cert. denied sub nom</u> <u>Blanks v. Bennett</u>, 540 U.S. 938 (2003).  A citation of

24  <u>Waltreus</u>, on the other hand, does not impose a procedural bar, because the rule of that case is

25  that habeas corpus cannot serve as a second appeal.  <u>Hill v. Roe</u>, 321 F.3d 787, 789 (9th Cir.

26  2003).  Reliance on <u>Lindley</u> is a procedural ruling, however, for that case holds sufficiency of

the evidence cannot be raised in a state habeas petition.  Carter v. Giurbino, 385 F.3d 1194, 1197

(9th Cir. 2004), cert. denied, 543 U. S. 1190 (2005).  Dixon erects another procedural bar; a

citation to Dixon means the issues should have been raised on direct appeal.  Park v. California,

202 F.3d 1146, 1151 (9th Cir. 2000).

            For a procedural bar to block federal review, the rule must be actually relied on in

the particular case in question.  Coleman, 501 U.S. at 735.  "[A] procedural default based on an

ambiguous order that does not clearly rest on independent and adequate state grounds is not

sufficient to preclude federal collateral review."  Morales v. Calderon, 85 F.3d 1387, 1392 (9th

Cir. 1996).  As the Ninth Circuit has recognized, when the California Supreme Court cites

several different cases in denying a state habeas petition, but does not specify which bar applies

to which of the grounds raised, the order is too ambiguous to provide the proper foundation for

the procedural bar that respondent asks this court to apply.  Calderon v. U.S. Dist. Court for

Eastern Dist. of California, 96 F.3d 1126, 1131 (9th Cir. 1996).  This court thus may reach the

merits of petitioner's claims.

VI.  Destruction Of Evidence

            Petitioner filed a motion for sanctions based on the alleged destruction of, among

other things, "(1) one pair of sweat pants (gray tattered)."  CT 148.  As he argues here, he

contended that correctional officials failed to preserve these items, which petitioner provided or

removed in response to Gold's instructions.  CT 148-151; Pet. at 19-20.  The Superior Court

denied the motion laconically: "Requires more than what you have written."  ART 26.

/////

/////

/////

/////

/////

/////

15

1      In California v. Trombetta, 467 U.S. 479, 488-89  (1984), the Supreme Court

2   held:

3          Whatever duty the Constitution imposes on the States to preserve
           evidence, that duty must be limited to evidence that might be
4          expected to play a significant role in the suspect's defense.  To
           meet this standard of constitutional materiality, evidence must both
5          possess an exculpatory value that was apparent before the evidence
           was destroyed, and be of such a nature that the defendant would be
6          unable to obtain comparable evidence by other reasonably
           available means.

7

8   The court further refined the test in Arizona v. Youngblood, 488 U.S. 51, 58 (1988), holding that

9   "unless a criminal defendant can show bad faith on the part of the police, failure to preserve

10  potentially useful evidence does not constitute a denial of due process of law."  See also Cooper

11  v. Calderon, 255 F.3d 1104, 1113-14 (9th Cir. 2001).

12      Petitioner has not satisfied either prong of the Trombetta/Youngblood test.  Gold

13  testified he removed the marijuana cigarette from the pocket of some denim pants that petitioner

14  wore over his sweat pants.  RT 81-82.  The heroin came from a seam of petitioner's boxer shorts.

15  RT 85-86, 302.  Gold kept the boxer shorts, but recalled returning the other clothing to petitioner

16  in the holding area.  RT 106.   The trial court found that the clothing had been put back into the

17  institution's clothing stores or lost, but noted there was little relevance to the sweat pants.  RT

18  335.

19      In light of the prosecution's version of events, the "exculpatory value" of the

20  sweat pants was not apparent before they were returned to petitioner or otherwise not preserved

21  because the contraband had been found in other locations.  Nor can petitioner show that the

22  failure to preserve the pants was done in bad faith in light of Gold's suggestion he returned the

23  clothing to petitioner, who had removed all his garments for the search.  RT 105-106.

24      Petitioner presented evidence that he was dressed only in the sweat pants and shirt

25  and argued that because the pants had no pockets, Gold's claim of discovering the marijuana and

26  indeed Gold's credibility was suspect.  Petitioner's witnesses testified that petitioner was wearing

16

sweat pants and that inmates were prohibited from having sweat pants with pockets.   RT 468,
478.  Thus, as in Trombetta, petitioner was "perfectly capable of raising" the issue without
presenting the actual sweat pants.  Trombetta, 467 U.S. at 490.

There was no constitutional violation.

VII.  The Denial Of The Pitchess Motion

Before trial, petitioner sought discovery about any investigations of Gold and his
supervisor Lieutenant Moore for perjury, planting evidence, falsifying information, and racial
bias; petitioner did so by filing a Pitchess motion.  CT 176(2)-176(12); Pitchess v. Superior
Court, 11 Cal.3d 531 (1974); see also Cal. Evid. Code §§ 1043-1045.  The court denied the
motion.  ART 21.  Petitioner renewed the motion at the close of the prosecution's case, but the
court once again denied it.  RT 334-335.

The Court of Appeal[8] rejected petitioner's claim:

> The defendant apparently abandons any claim it was error to deny
> the motion as to Lieutenant Moore, since he does not provide any
> argument in that respect.  As for Sergeant Gold, the defendant
> concedes, "the motion sought many items of information which are
> not within the realm of Pitchess" and "The declaration did not
> make the precise factual assertion that the defense at trial would
> show that evidence was planted, falsified, ethnic bias, or
> anticipating perjured testimony."  [sic]  He does not indicate how
> the trial court was to divine this specific basis for materiality from
> the general tenor of the request.

Answer, Ex. D at 3 (citation omitted).  Petitioner renews the claim in the instant proceeding.  Pet.
at 14-16 (20) (attached to petition as continuation pages).

Although a Pitchess motion is a creature of state law, it implicates a defendant's
due process right to receive exculpatory and impeachment evidence.  Harrison v. Lockyer, 316
F.3d 1063, 1065-66 (9th Cir.), cert. denied, 538 U.S. 988 (2003).

/////

---

[8]  Petitioner raised this claim in the Court of Appeal, but did not include it in his petition
for review.

1    In <u>Brady v. Maryland</u>, 373 U.S. 83, 86 (1963), the Supreme Court recognized a

2    prosecutor's obligation to reveal exculpatory evidence, whether substantive or for impeachment

3    purposes, when such evidence is "material" to the defense.  To establish a <u>Brady</u> violation, a

4    habeas petitioner must show three things:  that the evidence was favorable to him, either because

5    it is exculpatory, or because it is impeaching; the evidence must have been suppressed by the

6    prosecution either willfully or inadvertently; and defendant was prejudiced by the non-disclosure.

7    <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).

8    Petitioner has not met the threshold showing: nothing in his petition shows that

9    any documents or reports from either officer's personnel file meet the <u>Brady</u> standard of

10   materiality.  Accordingly, he has not borne his burden of showing a denial of due process.

11   VIII.  <u>Sufficiency Of The Evidence</u>

12   In <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979), the Supreme Court examined

13   the role of a habeas court in considering a challenge to the sufficiency of the evidence:

14   > [T]he relevant question is whether, after viewing the evidence in
   > the light most favorable to the prosecution, *any* rational trier of fact
15   > could have found the essential elements of the crime beyond a
   > reasonable doubt.
16

17   (emphasis in original).  In making this determination, a federal court should consider the state

18   law governing proof of the elements of the offense.  <u>Moore v. Duckworth</u>, 443 U.S. 713, 714

19   (1979).

20   In California, the crime of possession of drugs for sale, defined by California

21   Health & Safety Code §11351, has five elements:

22   > (1) defendant exercised dominion and control over the controlled
   > substance, (2) defendant was aware that he was in possession of a
23   > controlled substance, (3) defendant was aware of the nature of a
   > controlled substance, (4) the controlled substance was in an
24   > amount sufficient to be used for sale or consumption as a
   > controlled substance, and (5) defendant possessed a controlled
25   > substance with the specific intent to sell it.

26   <u>People v. Parra</u>, 70 Cal.App.4th 222, 226 (1999).  Petitioner challenges the sufficiency of only

1  the latter element, suggesting that Gold's opinion was the only evidence that petitioner possessed

2  the heroin for sale and that, unsupported by other factors, is insufficient.  Pet. at 18 (20)

3  (continuation page).

4           Petitioner is incorrect on the facts and the law.  It is true that Gold did give expert

5  testimony on the question of petitioner's intent in possessing the drugs, but this was supported by

6  Buda's expert testimony on the same point.  RT 272-275.  In California,

7           [i]n cases involving possession of marijuana or heroin, experienced
         officers may give their opinion that the narcotics are held for
8           purposes of sale based upon such matters as the quantity,
         packaging and normal use of an individual; on the basis of such
9           testimony convictions for purposes of sale have been upheld.

10  People v. Newman, 5 Cal.3d 48, 53 (1971); People v. Harris, 83 Cal.App.4th 371, 374-75 (2000).

11  In this case, the testimony of two expert witnesses was a sufficient basis for the jury's conclusion

12  that the four bindles of heroin, some sixty single doses, was possessed for sale.  RT 127; CT 378.

13  Petitioner was not denied his right to be convicted only upon sufficient evidence.

14           Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a

15  writ of habeas corpus be denied.

16           These findings and recommendations are submitted to the United States District

17  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

18  days after being served with these findings and recommendations, any party may file written

19  objections with the court and serve a copy on all parties.  Such a document should be captioned

20  /////

21  /////

22  /////

23  /////

24  /////

25  /////

26  /////

1  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

2  shall be served and filed within ten days after service of the objections.  The parties are advised

3  that failure to file objections within the specified time may waive the right to appeal the District

4  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

5  DATED:  August 18, 2006.

6

7

8                                                                              UNITED STATES MAGISTRATE JUDGE

9

10

2/wood1724.157

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26